1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. *17cv 3043 D*

---

MELISSA WILLIS AND RALPH TONEY,
INDIVIDUALLY AND AS THE
PERSONAL REPRESENTATIVES OF THE
ESTATE OF KYZR LEE WILLIS; AND
RALPH TONEY, JR.[1],
     PLAINTIFFS,

VS.

CITY OF BOSTON;
MARTIN J. WALSH, MAYOR OF BOSTON;
WILLIAM MORALES, BOSTON CENTERS
FOR YOUTH AND FAMILIES
COMMISSIONER;
FREDERICK B. AHERN, JR., CURLEY
COMMUNITY CENTER DIRECTOR AND
ADMINISTRATIVE COORDINATOR;
ALLISON BAKER, CURLEY
COMMUNITY CENTER SUMMER
PROGRAM SUPERVISOR;
JANE DOE[2], CURLEY
COMMUNITY CENTER CAMP
COUNSELOR,
     DEFENDANTS.

---

**COMPLAINT AND JURY DEMAND**

2017 SEP 21  P 1:30  SUFFOLK SUPERIOR COURT

## INTRODUCTION

1.    On the afternoon of July 26, 2016, seven-year-old Kyzr Lee Willis, of Dorchester,

Massachusetts, attended a municipal summer drop-in recreational program that involved

swimming activities in the ocean at the Curley Community Center ("CCC"), operated the

---

[1] Ralph Toney, Jr. is named as a Derivative-Plaintiff as his claim against Defendants is derivative of the claims made by the Personal Representatives on behalf of the Estate and statutory beneficiaries.

[2] Jane Doe is not this defendant-party's true legal name. Plaintiffs use this alias so that any of the Defendants, including Defendant Jane Doe, may have an opportunity to promptly move her name be impounded as she may be a minor.

City of Boston, Mayor Martin J. Walsh and his subordinates at the Boston Centers for Youth and Families ("BCYF").

2.  As a result of their lack of supervision, and as a result of not being provided a life jacket as required by state law, Kyzr Willis consciously suffered while drowning to death. His body was found in approximately ten feet of ocean water, close behind the CCC.

3.  This is a civil action sounding in statutory negligence, gross negligence, deliberate indifference, willful, wanton and reckless disregard and deprivation of constitutional rights brought by the Personal Representatives of the Estate of Kyzr Willis to enforce the rights of the Estate and the statutory beneficiaries (Kyzr Willis's mother and father) against Defendants for damages arising from the drowning death of Kyzr Willis, and for the financial and emotional damage Defendants caused the Estate, the statutory beneficiaries, and Derivative-Plaintiff, Ralph Toney, Jr. to suffer.

## PARTIES

4.  Plaintiffs Melissa Willis and Ralph Toney are the parents of the decedent, Kyzr Willis, and they reside, as did Kyzr during his lifetime, in Dorchester, Suffolk County, Massachusetts. Melissa Willis and Ralph Toney are the duly-appointed Personal Representatives for the Estate of Kyzr Willis, and are Kyzr's heirs-at-law and next of kin and thus, the statutory beneficiaries in this action. Additionally, Melissa Willis and Ralph Toney are Derivative-Plaintiffs as they were bystanders (a well-recognized legal term of art) at the Curley Community Center for much, if not all, of the horror arising from the drowning and death of their son on July 26, 2016.

5.    Derivative-Plaintiff Ralph Toney, Jr. ("Ralph, Jr") is Kyzr Willis's brother. Ralph, Jr. was a bystander at the Curley Community Center for most, if not all, of the horror arising from the drowning and death of his brother on July 26, 2016.

6.    Defendant City of Boston is a municipal corporation and legal person, headquartered at City Hall, Boston, Suffolk County, Commonwealth of Massachusetts.  Defendant City of Boston is the public employer of Mayor Martin J. Walsh and of the below-identified employees and officials of its Boston Centers for Youth and Families ("BCYF") and Curley Community Center ("CCC").

7.    Defendant Martin J. Walsh, at all relevant times, is a person employed as Mayor by Defendant City of Boston. Mayor Walsh took office as Mayor in 2014. At all relevant times, Mayor Walsh was acting within the scope of his public employment as Mayor of the City of Boston and under color of law. At all relevant times, Mayor Walsh was and is believed to remain a resident of the Commonwealth of Massachusetts. Mayor Walsh is sued herein in his official capacity and individual capacity.

8.    Defendant Walsh's official title, at all times relevant, is Mayor of Boston, wherein his general duties include serving as head of the municipal government of City of Boston. In this capacity, Walsh specifically oversees BCYF and its network of community centers, including the CCC.

9.    Defendant William Morales, at all relevant times, is a person employed by Defendant City of Boston at its Boston Centers for Youth and Families agency. At all relevant times, Defendant Morales was employed by the City of Boston as its BCYF Commissioner. At all relevant times, Defendant Morales was acting within the scope of his public employment and under color of law.  At all relevant times, Defendant Morales was and is

3

believed to remain a resident of the Commonwealth of Massachusetts. Defendant Morales is sued herein in his official capacity and individual capacity.

10.    Defendant Morales's official title, at all times relevant, is Commissioner of Boston Centers for Youth & Families ("BCYF"), serving within the Mayor of Boston's Health and Human Services Cabinet. In this capacity, Morales oversees BCYF's network of 36 facilities, including 30 community centers located throughout the City of Boston serving over 90,000 people annually. Among the many programs offered by BCYF since its founding in 1972 are the Mayor's Summer Jobs Program, out-of-school time programs, adult education, sports and fitness, arts, girls-only, senior, enrichment opportunities and the nationally recognized youth violence prevention and intervention Streetworker Program.

11.    Defendant Frederick B. Ahern, Jr., at all relevant times, is a person employed by Defendant City of Boston at the Curley Community Center. At all relevant times, Ahern was employed by the Defendant City of Boston as its CCC Director and Administrative Coordinator. At all relevant times, Ahern was acting within the scope of his public employment and under color of law. At all relevant times, Ahearn was and is believed to remain a resident of the Commonwealth of Massachusetts. Defendant Ahern is sued herein in his official capacity and individual capacity.

12.    Defendant Ahern's official title, at all times relevant, is Director and Administrative Coordinator for BCYF's Curley Community Center. In this capacity, Defendant Ahern oversees the CCC's summer drop-in youth program that was attended by Kyzr Willis until his drowning death.

13.    Defendant Allison Baker, at all relevant times, is a person employed by Defendant City of Boston at its Curley Community Center. At all times relevant, Baker was employed by the

4

Defendant City of Boston as its CCC Summer Program Supervisor. At all relevant times, Baker was acting within the scope of her public employment and under color of law. At all relevant times, Baker was and is believed to remain a resident of the Commonwealth of Massachusetts. Defendant Baker is sued herein in her official capacity and individual capacity.

14. Defendant Baker's official title, at all times relevant, is Supervisor of the Curley Community Center Summer Programs. In this capacity, Defendant Baker oversees the CCC's summer drop-in youth program that was attended by Kyzr Willis until his drowning and death.

15. Defendant Jane Doe, at all relevant times, is an individual employed by Defendant City of Boston at its Curley Community Center. At all relevant times, Doe was employed by the Defendant City of Boston as one of its CCC summer camp counselors. At all relevant times, Doe was acting within the scope of her public employment and under color of law. At all relevant times, Doe was and is believed to remain a resident of the Commonwealth of Massachusetts. Defendant Doe is sued herein in her official capacity and individual capacity. *See fn. 2 supra.*

16. Defendant Doe, at all relevant times, was a camp counselor at Curley Community Center.

17. Boston Centers for Youth and Families ("BCYF") is a human service agency operated by Defendant City of Boston through its Mayor. BCYF has a place of business at 885 Washington Street, Boston, Suffolk County, Commonwealth of Massachusetts. Defendant City of Boston is the public employer of BCYF's employees and officials.

18. Curley Community Center ("CCC") is one of the community centers operated by Defendant City of Boston through its Mayor and its BCYF. CCC is located at 1663

Columbia Road, Boston, Suffolk County, Commonwealth of Massachusetts. Defendant City of Boston is the public employer of all CCC's employees and officials.

19.     Teesha Rodriguez, Bridget Collins, and Ivanna Perez, at all relevant times, are persons employed by Defendant City of Boston at its Curley Community Center. At all relevant times, including on July 26, 2016, Teesha Rodriguez, Bridget Collins, and Ivanna Perez, were employed by the Defendant City of Boston and working as CCC Summer Program lifeguards, with Teesha Rodriguez as a lifeguard supervisor. At all relevant times, Teesha Rodriguez, Bridget Collins, and Ivanna Perez were acting within the scope of their public employment and under color of law. At all relevant times, Teesha Rodriguez, Bridget Collins, and Ivanna Perez were and are believed to remain residents of the Commonwealth of Massachusetts. Teesha Rodriguez, Bridget Collins, and Ivanna Perez are referred to herein in their official capacity.

### FACTS COMMON TO ALL COUNTS

20.     On July 26, 2016, seven-year-old Kyzr Willis, together with his nine-year-old brother Ralph, Jr., nine-year-old cousin Savanah Broxton, and approximately 53 additional young children, attended the City of Boston's Summer Youth Activities Program, a summer drop-in camp program run through its BCYF and CCC.

21.     Operation of the City of Boston's Summer Youth Activities Program at the CCC was represented to Kyzr Willis's parents and to the Boston parents and guardians of other children as a summer drop-in camp program that provided a supervised opportunity for their children to safely play and swim in the ocean off Carson Beach.

22.   On July 26, 2016, the approximate 56 minor children who attended the program were expected to be supervised and kept safe by approximately 3 lifeguards and 19 camp counselors, some of whom were interns, and most, if not all, were teenagers.

23.   Kyzr Willis, his brother Ralph Jr., and their cousin Savanah Broxton were the 7th, 8th, and 9th campers to sign in that morning.

24.   They brought their lunches as the City of Boston Summer Youth Activities Program at the CCC did not provide lunch and informed the campers' parent and guardians in writing that it provided supervision but not lunch to the children attending the program.

25.   Kyzr was a loving, affectionate, and bright child.  He was handsome with a broad and easy smile.

26.   It was well-known by most, if not all, of the counselors that Kyzr was a non-swimmer.

27.   It was well-known by most, if not all, of the lifeguards that Kyzr was a non-swimmer.

28.   It was well-known by most, if not all, of the counselors and lifeguards that Kyzr preferred the slip 'n slide and hunting for crabs.

29.   On that day, Kyzr, who was wearing his fluorescent swim trunks, a gift from Allison Baker, expressed to camp counselor Jane Doe that he wanted a life jacket, but was told by Jane Doe that there were only pink ones for girls available, so he never was given a life jacket.

30.   During that entire day, not a single lifeguard, not a single camp counselor, not a single camp supervisor or director made Kyzr wear a lifejacket as he played close to and in the ocean.

31.   At approximately 2:15 p.m., Allison Baker gave the signal to the lifeguards and camp counselors to clear all of the campers from the water and the beach and to send the campers to the locker room to change into their street clothes for dismissal home.

32.   As the campers were being told to leave the beach, the tide was coming in strong according to a lifeguard intern. Lifeguard Supervisor Teesha Rodriguez stated that the water gets deep very quickly when the tide comes in.

33.   Boston Police reported that the beach drops off quickly and the water becomes very deep.

34.   As the water and beach were cleared of campers, no head count was conducted, no buddy system was employed, and the campers were not closely supervised.

35.   At 2:30 p.m., lifeguards Teesha Rodriguez, Bridget Collins and Ivanna Perez reported that the beach was clear of all swimmers, and walked off the beach.

36.   At the time the beach was being cleared of swimmers, Frederick Ahern and other camp staff were busy preparing to close the camp.

37.   No one was sure when or if Kyzr exited the ocean water and, if he exited, where he went.

38.   According to reports published in the *Boston Globe* and in other media, Boston Police Commissioner William B. Evans stated that efforts to find Kyzr were complicated by conflicting information provided by witnesses at the scene.  "We had a lot of little kids telling us different things, so it was hard to figure out what actually happened," Evans said.

39.   While in the bathhouse, sometime between 2:15 and 2:30 p.m., Ralph Jr. noticed that Kyzr was missing and that his clothes were still next to his belongings.  He alerted a camp co-supervisor that Kyzr was missing.

40.   That camp counselor informed Allison Baker that Kyzr was missing and a panicked search of the CCC began for him. Allison Baker attempted to reach Frederick Ahern on his cell phone, but he did not answer.

41.   Allison Baker later found Frederick Ahern as he was busy checking various areas of the facility to make sure the counselors were cleaning up properly. She told him Kyzr was missing and that they were searching for him.

42.   Camp counselors first searched the building and then the surrounding land and streets. Later, at approximately 2:40 p.m., the lifeguards were informed that Kyzr was missing and the counselors helped the lifeguards search the water for Kyzr.

43.   No one knew where Kyzr had gone or where he was.

44.   Critically, the CCC video surveillance cameras that could have aided in the search for Kyzr were out of commission and had been so since at least October 2015.

45.   At some point, Melissa Willis received a frantic phone call from nine-year-old Savanah, informing her that Kyzr was missing and that no knew where he was.

46.   An unknown adult, using Savanah's phone, then informed Melissa Willis that they were trying to locate Frederick Ahern but were unable to find him.

47.   Melissa Willis immediately rushed to the camp. Upon her arrival at the CCC, no one was able to provide her with any information as to Kyzr's whereabouts or well-being.

48.   According to Boston Police and State Police, the first 911 call did not come in until approximately a half hour after the search for Kyzr Willis began inside the CCC.

49.   At approximately 2:49 p.m., long after Ralph Jr. had reported Kyzr missing, Frederick Ahern communicated a missing child situation to Boston Police.

50.   Boston Police arrived at approximately 2:53 p.m. to aid in the search, but Boston Police Commissioner William B. Evans said efforts to find Kyzr were complicated by conflicting information provided by witnesses at the scene.

51.   At 6:00 p.m., the Boston Police Harbor Patrol Unit and Quincy Police Harbor Patrol picked up an underwater image of Kyzr's body on sonar.

52.   Boston Police divers retrieved Kyzr's body, and he was pronounced dead just before 7:10 p.m.  Kyzr's body had been found a short distance from the CCC, face down at the bottom of about 10 feet of ocean water.

53.   Kyzr's parents were not allowed to identify his body in the morgue, instead, the Office of the Chief Medical Examiner used dental records to confirm his identity.

54.   After much publicity surrounding the 2007 drowning death of four-year-old Christian Frechette, of Sturbridge, Massachusetts, "Christian's Law," Mass. Gen. Laws c. 111, § 127A1/2, was enacted on July 12, 2012.

55.   Christian's Law, both in scope and spirit, mandated that significant water safety precautions for municipal and recreational programs and camps should be implemented in order to have a system in place for ensuring the safety and well-being of minor children. It further mandated that Coast Guard-approved personal flotation devices be made available to all non-swimmers and at-risk swimmers at programs or camps that conduct swimming activities at marine or freshwater beaches.  All children participating in these camps were mandated to undergo swimming proficiency testing prior to being allowed into the water. Further, all children participating in these camps were to be issued color-coded wristbands denoting their level of swimming proficiency. In its revised interim guidance regarding Christian's Law, the Massachusetts Department of Public Health set forth minimum standards for programs and camps to have a system in place to ensure that Coast Guard-approved personal floatation devices would be available and worn by children in swimming areas who are non-swimmers or at-risk swimmers.

56.   At all relevant times, Christian's Law, as well as mature common sense, mandated that the City of Boston, BCYF and CCC ensure that campers like Kyzr wear a life jacket when in or near the ocean.

57.   Kyzr was not tested for swim ability, was not given a personal floatation device, and was not wearing a wristband or anything else to indicate that he was a non-swimmer in clear violation of the requirements of Christian's Law.

58.   Neither the City of Boston, BCYF nor CCC advised Kyzr's parents that they would not require Kyzr, as a non-swimmer, to wear a life jacket when engaged in activities in or near the ocean.

59.   Nor were Kyzr's parents advised by the BCYF or CCC that they, as Kyzr's parents, had the option of personally providing Kyzr with his own personal floatation device.   Rather, Kyzr's parents were informed in a joint BCYF/CCC writing that it would provide Kyzr with everything but lunch.

60.   Earlier and to much public acclaim, Martin J. Walsh, during his tenure as a member of the Massachusetts House of Representatives, voted in favor of the passage of Christian's Law, and therefore, was well-aware of its intent, scope and purpose.

61.   In the spring of 2016, just several months before Kyzr's wholly-avoidable death, the Massachusetts Department of Public Health provided Mayor Martin Walsh, BCYF Commissioner William Morales, CCC Director Ahern, and CCC Summer Camp Supervisor Allison Baker with additional written guidance regarding Christian's Law in which it set forth minimum standards for programs and camps to have a system in place to ensure that Coast Guard-approved personal floatation devices would be available and worn by children in swimming areas who are non-swimmers or at-risk swimmers.

62.   Mayor Martin Walsh, BCYF Commissioner William Morales, CCC Director Ahern, and CCC Summer Camp Supervisor Allison Baker deliberately and callously disregarded, ignored, and failed to implement this information.

63.   As Mayor of the City of Boston, Defendant Walsh knew that he and his administration owed a special duty of care to protect the most vulnerable children of Boston who participated in swimming activities at its municipal recreational camps and programs at freshwater and ocean beaches, and to implement the policies, procedures and protocols required by Christian's Law.

64.   Although the City of Boston and its recreational programs and camps were mandated to comply with Christian's Law, neither Defendant City of Boston, Martin Walsh or any of his subordinate BCYF or CCC employees or officials took care to mention or refer to Christian's Law or to set forth any of the provisions mandated by that Law in its BCYF Swimming Handbook 2016, the 2016 Summer Aquatic Safety Meeting, the Summer Youth Activities Program 2016 Rules & Regulations, or in any of its training for supervisors, camp counselors or lifeguards, or in any of the documents it required Kyzr's parents to sign before their son could participate in the City of Boston's BCYF's summer drop-in program at CCC which involved swimming activities in the ocean.

65.   At all relevant times, the City of Boston, through its Mayor, its employees and through its BCYF and CCC officials, had a duty to care for and protect the safety of its young campers, especially its most vulnerable campers who could not swim: (1) by hiring and maintaining an adequate number of certified lifeguards and well-trained camp counselors; (2) by having the Mayor and appropriate directors, commissioners, administrators, and supervisors establish and/or implement adequate policies for CCC lifeguards and camp counselors so

that they provide the proper care and safety to its young campers; (3) by adequately training and then supervising its lifeguards and camp counselors to care for and protect the safety of its campers; (4) by having its lifeguards and camp counselors adequately supervise its campers at all times; (5) by adequately maintaining CCC's video surveillance system; and, (6) by implementing the mandates of Christian's Law to provide its campers with appropriate personal flotation devices, by having the children properly swim-tested prior to allowing the children to use the beach facilities, and by issuing the appropriate color-coded wristband based on the results of each child's swim test.

66.  The City of Boston, Martin Walsh, William Morales, Frederick Ahern, and Allison Baker hired many young individuals, most or all of whom were local teenagers, who were lacking in a mature or trained judgment to be lifeguards and camp counselors at CCC's drop-in summer program, knowing that many of its campers would be non-swimmers and at risk of drowning to death in the ocean without life jackets and proper supervision.

67.  The City of Boston, Martin Walsh, William Morales, Frederick Ahern, and Allison Baker ignored Christian's Law and did nothing to adequately train those individuals who were hired to be lifeguards and camp counselors at CCC about the purpose, scope or requirements of Christian's Law.

68.  Without such training, these individuals were unfit to be lifeguards and camp counselors at CCC of non-swimmer, minor children campers.

69.  The City of Boston, Martin Walsh, William Morales, Frederick Ahern, and Allison Baker ignored Christian's Law and their duty to keep its non-swimmer campers safe and alive in and near the ocean and did nothing to supervise CCC's lifeguards and camp counselors to

make sure that the requirements of Christian's Law were maintained and the young campers safe and alive.

70.   Without either proper training in the purpose, scope and requirements of Christian's Law or close supervision to see that the requirements of Christian's Law were not violated and causing a non-swimmer's life to be put at grave risk of harm, CCC camp counselor Jane Doe was unfit to keep Kyzr Willis safe and alive, despite her duty of care to do so.

71.   Upon learning of Kyzr Willis's death, Mayor Walsh acknowledged publicly that: "Thousands of families entrust their kids to us every single day here in the city of Boston through our different programs, and we take this trust very seriously."

72.   Pursuant to Mass. Gen. Laws c. 258, § 4, a proper and timely presentment of the Plaintiffs' claims of damage were made to the City of Boston.  The requisite time for a response by the City has elapsed without settlement of the claims.

## COUNT I

**Against Defendant City of Boston for the Negligent and Other Wrongful Acts and
Omissions of its Public Employees and Officials, acting in their official capacity,
For Causing Kyzr Willis's Death and Immediately Preceding Conscious Pain and Suffering
Pursuant to Mass. Gen. Laws c. 258, §§ 2, 10(a), 10(j), 10(j)(3), and
Mass. Gen. Laws c. 229, §§ 2, 6, and 11**

73.    The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 72 above.

74.    Pursuant to Mass. Gen. Laws c. 258, § 2, public employers shall be liable for personal

       injury or death caused by the negligent or other wrongful act or omission of any public

       employee while acting within the scope of his office or employment, in the same manner

       and to the same extent as a private individual under like circumstances.

75.    Pursuant to Mass. Gen. Laws c. 229, § 2, a person who (1) by his negligence causes the

       death of a person, or (2) by willful, wanton or reckless act causes the death of a person

       under such circumstances that the deceased could have recovered damages for personal

       injuries if his death had not resulted, shall be liable in damages in the amount of: (1) the

       fair monetary value of the decedent to the persons entitled to receive the damages

       recovered, including but not limited to compensation for the loss of the reasonably

       expected net income, services, protection, care, assistance, society, companionship,

       comfort, guidance, counsel, and advice of the decedent to the persons entitled to the

       damages recovered; (2) the reasonable funeral and burial expenses of the decedent; (3)

       punitive damages in an amount of not less than five thousand dollars in such case as the

       decedent's death was caused by the malicious, willful, wanton or reckless conduct of the

       defendant or by the gross negligence of the defendant; and a person shall be liable for the

       negligence or the willful, wanton or reckless act of his agents or servants while engaged in

his business to the same extent and subject to the same limits as he would be liable under this section for his own act.

76.   Under the instant facts and applicable law, and at all times relevant in this matter, the City of Boston is a legal person and the public employer of Boston Mayor Martin J. Walsh, BCYF Commissioner William Morales, CCC Director and Administrative Coordinator Frederick B. Ahern, Jr., CCC Summer Program Supervisor Allison Baker, CCC Summer Camp Counselor Jane Doe, and CCC Lifeguards including, but not limited to, Teesha Rodriguez, Bridget Collins and Ivanna Perez, all of whom are public employees of the City of Boston who were acting within the scope of their City of Boston employ.

77.   Pursuant to Mass. Gen. Laws c. 258, § 10(a), public employers are liable for personal injury or death when the public employee does not exercise due care in the execution of any statute, regulation of a public employer, municipal ordinance or by-law.

78.   Pursuant to Mass. Gen. Laws c. 258, § 10(j), public employers are liable for personal injury or death originally caused by the public employer or any other person acting on behalf of the public employer.

79.   Pursuant to Mass. Gen. Laws c. 258, § 10(j)(3), public employers are liable for personal injury or death due to the negligent maintenance of public property.

80.   At all relevant times, the Defendant City of Boston's Mayor and its other employees and officials at BCYF and CCC owed a duty of care to Kyzr Willis and his family to implement policies, procedures and protocols as required by Christian's Law, and to provide proper and adequate training and supervision of its lifeguards and camp counselors so its lifeguards and camp counselors would and could provide proper and adequate care and supervision to the non-swimmer children, including Kyzr Willis, attending its summer

16

drop-in program at the CCC on Carson Beach that included safe activities and instruction in and nearby the ocean.

81.    At all times relevant, Kyzr Willis was a member of a small, well-defined group of vulnerable children to which the City of Boston and its employees and officials owed a duty of care to keep safe while he engaged in camp activities in and near the ocean waters at its drop-in program at CCC.

82.    The Defendant City of Boston (1) failed to swim-test Kyzr or any other camp participants; (2) failed to provide Kyzr a bracelet indicating his inability to swim, as well as failed to provide bracelets for all camp participants; (3) failed to have Kyzr wear a personal flotation device; (4) failed to properly supervise Kyzr throughout the day; (5) failed to upgrade the inoperable CCC video surveillance system; (6) failed to provide a sufficient number of adequately trained and supervised counselors and lifeguards per child, so that all children were properly supervised; and (7) failed to inform Kyzr's parents that they would allow Kyzr to play in and near the ocean without a life jacket and that they (his parents) had the option of personally providing Kyzr with a personal flotation device.

83.    As a direct and proximate result of the gross negligence of above-named Defendant City of Boston, its employees and officials, seven-year-old Kyzr Willis suffered a terrifying and painful drowning which ultimately resulted in his wrongful death.

84.    As described more fully above, Defendant City of Boston through its above-named employees and officials breached its duty of care to Kyzr Willis and his family.

85.    As a direct and proximate result of the negligent and other wrongful conduct of Defendant City of Boston's above-named employees and officials, Kyzr Willis was caused to suffer conscious physical pain, emotional distress, and loss of life as he drowned to death at camp.

17

86. As a direct and proximate result of the harm caused to Kyzr Willis, Defendant City of Boston through its above-named employees and officials caused his family to suffer financial and emotional harms.

87. Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law allowable under Mass. Gen. Laws Chapters 258 and 229 on behalf of the Estate and statutory beneficiaries for Kyzr Willis's conscious pain and suffering and death. Additionally, the Personal Representatives seek to recover damages to the fullest extent of the law for the fair monetary value of Kyzr Willis including, but not limited to, compensation for the loss of his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, advice of the decedent, his reasonable funeral and burial expenses, for their resulting emotional distress, and for punitive damages in an amount of not less than five thousand dollars where Kyzr's death was caused by Defendant's reckless or gross negligence.  Additionally, Plaintiffs seek interest thereon from the date of the commencement of the action, even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law. See also, *supra*, Derivative-Plaintiffs' Counts for Negligent Infliction of Emotional Distress.

## COUNT II

**Against Defendant Martin J. Walsh, in His Individual Capacity,
For Kyzr Willis's Grossly Negligent Wrongful Death and
Immediately Preceding Conscious Pain and Suffering Pursuant to
Mass. Gen. Laws c. 229, §§ 2, 6 and 11**

88. The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 87 above.

89. At all relevant times, the Defendant Walsh owed a duty of care to Kyzr Willis and his family to implement policies, procedures and protocols as required by Christian's Law, and to provide proper and adequate training and supervision of City of Boston lifeguards and camp counselors so its lifeguards and camp counselors would and could provide proper and adequate care and supervision to the non-swimmer children, including Kyzr Willis, attending its summer drop-in program at the CCC on Carson Beach that included safe activities and instruction in and nearby the ocean.

90. As described more fully above, Defendant Walsh breached his duty of care to Kyzr Willis and his family.

91. As a direct and proximate result of the willful, wanton or reckless conduct or the gross negligence of Defendant Walsh, Kyzr Willis was caused to suffer conscious physical pain, emotional distress, and loss of life as he drowned to death at camp.

92. As a direct and proximate result of the harm caused to Kyzr Willis, Defendant Walsh caused his family to suffer financial and emotional harms.

93. Defendant Walsh, in a grossly negligent manner, failed to order the implementation of the provisions of Christian's Law, and thus (1) failed to swim-test Kyzr or any other camp participants; (2) failed to provide Kyzr a bracelet indicating his inability to swim, as well as failed to provide bracelets for all camp participants; (3) failed to have Kyzr wear a personal flotation device; (4) failed to properly supervise Kyzr throughout the day; (5)

failed to upgrade the inoperable CCC video surveillance system; (6) failed to provide a sufficient number of adequately trained and supervised counselors and lifeguards per child, so that all children were properly supervised; and (7) failed to inform Kyzr's parents that they had the option of personally providing Kyzr with a personal flotation device.

94.   As a direct and proximate result of the gross negligence of Defendant Walsh, seven-year-old Kyzr Willis suffered a terrifying and painful drowning which ultimately resulted in his wrongful death.

95.   Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law allowable under Mass. Gen. Laws c. 229 on behalf of the Estate and statutory beneficiaries for Kyzr Willis's conscious pain and suffering and death.  Additionally, the Personal Representatives seek to recover damages to the fullest extent of the law for the fair monetary value of Kyzr Willis including, but not limited to, compensation for the loss of his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, advice of the decedent, his reasonable funeral and burial expenses, for their resulting emotional distress, and for punitive damages in an amount of not less than five thousand dollars where Kyzr's death was caused by Defendant's reckless or gross negligence.  Additionally, Plaintiffs seek interest thereon from the date of the commencement of the action, even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law. *See also, supra*, Derivative-Plaintiffs' Counts for Negligent Infliction of Emotional Distress.

## COUNT III

**Against Defendant William Morales, in His Individual Capacity,
For Kyzr Willis's Grossly Negligent Wrongful Death and
His Immediately Preceding Conscious Pain and Suffering Pursuant to
Mass. Gen. Laws c. 229, §§ 2, 6 and 11**

96.    The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 95 above.

97.    At all relevant times, Defendant Morales owed a duty of care to Kyzr Willis and his family to implement policies, procedures and protocols as required by Christian's Law, and to provide proper and adequate training and supervision of City of Boston lifeguards and camp counselors so its lifeguards and camp counselors could and would provide proper and adequate care and supervision to the non-swimmer children, including Kyzr Willis, attending its summer drop-in program at the CCC on Carson Beach that included activities and in and near the ocean.

98.    As described more fully above, Defendant Morales breached his duty of care to Kyzr Willis and his family.

99.    As a direct and proximate result of the willful, wanton or reckless conduct or gross negligence of Defendant Morales, Kyzr Willis was caused to suffer conscious physical pain, emotional distress, and loss of life as he drowned to death at camp.

100.    As a direct and proximate result of the harm caused to Kyzr Willis, Defendant Morales caused his family to suffer financial and emotional harms.

101.    Defendant Morales, in a grossly negligent manner, failed to order the implementation of the provisions of Christian's Law, and thus (1) failed to swim-test Kyzr or any other camp participants; (2) failed to provide Kyzr a bracelet indicating his inability to swim, as well as failed to provide bracelets for all camp participants; (3) failed to have Kyzr wear a personal flotation device; (4) failed to properly supervise Kyzr throughout the day; (5)

21

failed to upgrade the inoperable CCC video surveillance system; (6) failed to provide a sufficient number of adequately trained and supervised counselors and lifeguards per child, so that all children were properly supervised; and (7) failed to inform Kyzr's parents that they had the option of personally providing Kyzr with a personal flotation device.

102.   As a direct and proximate result of the gross negligence of Defendant Morales, seven-year-old Kyzr Willis suffered a terrifying and painful drowning which ultimately resulted in his wrongful death.

103.   Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law allowable under Mass. Gen. Laws c. 229 on behalf of the Estate and statutory beneficiaries for Kyzr Willis's conscious pain and suffering and death.  Additionally, the Personal Representatives seek to recover damages to the fullest extent of the law for the fair monetary value of Kyzr Willis including, but not limited to, compensation for the loss of his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, advice of the decedent, his reasonable funeral and burial expenses, for their resulting emotional distress, and for punitive damages in an amount of not less than five thousand dollars where Kyzr's death was caused by Defendant's gross negligence, deliberate indifference, and willful, wanton and reckless conduct.  Additionally, Plaintiffs seek interest thereon from the date of the commencement of the action, even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law. *See also, supra,* Derivative-Plaintiffs' Counts for Negligent Infliction of Emotional Distress.

## COUNT IV

**Against Defendant Frederick B. Ahern, Jr., in His Individual
Capacity, for Kyzr Willis's Grossly Negligent Wrongful Death and
His Immediately Preceding Conscious Pain and Suffering Pursuant to
Mass. Gen. Laws c. 229, §§ 2, 6 and 11**

104.   The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 103 above.

105.   At all relevant times, Defendant Ahern owed a duty of care to Kyzr Willis and his family

to implement policies, procedures and protocols as required by Christian's Law, and to

provide proper and adequate training and supervision of City of Boston lifeguards and

camp counselors so its lifeguards and camp counselors would and could provide proper

and adequate care and supervision to the non-swimmer children, including Kyzr Willis,

attending its summer drop-in program at the CCC on Carson Beach that included safe

activities and instruction in and nearby the ocean.

106.   As described more fully above, Defendant Ahern breached his duty of care to Kyzr Willis

and his family.

107.   As a direct and proximate result of the willful, wanton or reckless conduct or gross

negligence of Defendant Ahern, Kyzr Willis was caused to suffer conscious physical pain,

emotional distress, and loss of life as he drowned to death at camp.

108.   As a direct and proximate result of the harm caused to Kyzr Willis, Defendant Ahern

caused his family to suffer financial and emotional harms.

109.   Defendant Ahern, in a grossly negligent manner, failed to order the implementation of the

provisions of Christian's Law, and thus (1) failed to swim-test Kyzr or any other camp

participants; (2) failed to provide Kyzr a bracelet indicating his inability to swim, as well

as failed to provide bracelets for all camp participants; (3) failed to have Kyzr wear a

personal flotation device; (4) failed to properly supervise Kyzr throughout the day; (5)

failed to upgrade the inoperable CCC video surveillance system; (6) failed to provide a sufficient number of adequately trained and supervised counselors and lifeguards per child, so that all children were properly supervised; and (7) failed to inform Kyzr's parents that they had the option of personally providing Kyzr with a personal flotation device.

110.  As a direct and proximate result of the gross negligence of Defendant Ahern, seven-year-old Kyzr Willis suffered a terrifying and painful drowning which ultimately resulted in his wrongful death.

111.  Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law allowable under Mass. Gen. Laws c. 229 on behalf of the Estate and statutory beneficiaries for Kyzr Willis's conscious pain and suffering and death.  Additionally, the Personal Representatives seek to recover damages to the fullest extent of the law for the fair monetary value of Kyzr Willis including, but not limited to, compensation for the loss of his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, advice of the decedent, his reasonable funeral and burial expenses, for their resulting emotional distress, and for punitive damages in an amount of not less than five thousand dollars where Kyzr's death was caused by Defendant's gross negligence, deliberate indifference, and willful, wanton and reckless conduct.  Additionally, Plaintiffs seek interest thereon from the date of the commencement of the action, even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.  *See also, supra,* Derivative-Plaintiffs' Counts for Negligent Infliction of Emotional Distress.

## COUNT V

**Against Defendant Allison Baker, in Her Individual Capacity,
For Kyzr Willis's Grossly Negligent Wrongful Death and
His Immediately Preceding Conscious Pain and Suffering Pursuant to
Mass. Gen. Laws c. 229, §§ 2, 6 and 11**

112.    The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 111 above.

113.    At all relevant times, Defendant Baker owed a duty of care to Kyzr Willis and his family
to follow policies, procedures and protocols as required by Christian's Law, and to provide
proper and adequate training and supervision to City of Boston lifeguards and camp
counselors so the lifeguards and camp counselors would and could provide proper and
adequate care and supervision to the non-swimmer children, including Kyzr Willis,
attending the summer drop-in program at the CCC on Carson Beach that included safe
activities and instruction in and nearby the ocean.

114.    As described more fully above, Defendant Baker breached her duty of care to Kyzr Willis
and his family.

115.    As a direct and proximate result of the willful, wanton or reckless conduct or gross
negligence of Defendant Baker, Kyzr Willis was caused to suffer conscious physical pain,
emotional distress, and loss of life as he drowned to death at camp.

116.    As a direct and proximate result of the harm caused to Kyzr Willis, Defendant Baker caused
his family to suffer financial and emotional harms.

117.    At all relevant times when Defendant Baker was engaged in training her subordinate camp
counselors and lifeguards, Defendant Baker was grossly negligent in that she knew or
should have known the obvious consequences of her training deficiencies about the
mandates of Christian's Law or the inherent dangers that ocean water presented to non-
swimmers and common methods to ameliorate these dangers such as taking frequent head

counts and taking head counts immediately upon exiting the ocean, establishing buddy systems with campers of like swimming ability, assigning specific counselors to closely monitor a specific and small number of campers at all times, mandating that all non-swimmers must wear life jackets when in the ocean or on the beach, instructing lifeguards and counselors to be mindful and cautious of strong tides or large waves, and implementing an obvious method for identifying non-swimmers.

118.  At all relevant times when Defendant Baker was engaged in supervising her subordinate camp counselors and lifeguards, Defendant Baker, in a grossly negligent manner, disregarded what she knew or should have known were the obvious consequences of her supervision deficiencies that failed to ensure that her subordinate camp counselors and lifeguards made sure that non-swimmers wore personal flotation devices, and that the non-swimmers were being constantly and closely monitored, both in and out of the water.

119.  Defendant Baker's deficient training and supervision of her subordinate lifeguards and camp counselors rendered them inadequately qualified for their jobs, and actually caused camp counselor Jane Doe's grossly negligent actions of not providing Kyzr Willis with a personal flotation device before he engaged in activities in and near the ocean, and by not closely monitoring him at all times.

120.  As a direct and proximate result of Defendant Baker's deficient training and supervision of her subordinate lifeguards and camp counselors, no one knew that Kyzr was missing until his nine-year-old brother, Ralph Jr., reported Kyzr's absence toward the end of the camp day, and no one knew where Kyzr was until the police found him dead at the bottom of the ocean in approximately 10 feet of water.

121. At all relevant times, Defendant Baker showed a grossly negligent disregard for her campers' safety and well-being, and Defendant Baker's deficient training and supervision of her subordinates was closely linked to Jane Doe's conduct that actually led to the death of Kyzr Willis.

122. At all relevant times, Defendant Baker knew, or should have known, that a pervasive and unreasonable risk of serious harm or death was likely to result to a non-swimmer like Kyzr Willis and her actions were grossly negligent.

123. As described more fully above, Defendant Baker breached her duty of care to Kyzr Willis and his family.

124. As a direct and proximate result of the gross negligence of Defendant Baker, Kyzr Willis was caused to suffer conscious physical pain, emotional distress, and loss of life as he drowned to death at camp.

125. As a direct and proximate result of the harm caused to Kyzr Willis, Defendant Baker caused his family to suffer financial and emotional harms.

126. As a direct and proximate result of the gross negligence of Defendant Baker, seven-year-old Kyzr Willis suffered a terrifying and painful drowning which ultimately resulted in his wrongful death.

127. Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law allowable under Mass. Gen. Laws c. 229 on behalf of the Estate and statutory beneficiaries for Kyzr Willis's conscious pain and suffering and death.  Additionally, the Personal Representatives seek to recover damages to the fullest extent of the law for the fair monetary value of Kyzr Willis including, but not limited to, compensation for the loss of his reasonably expected net income, services, protection, care, assistance, society,

companionship, comfort, guidance, counsel, advice of the decedent, his reasonable funeral and burial expenses, for their resulting emotional distress, and for punitive damages in an amount of not less than five thousand dollars where Kyzr's death was caused by Defendant's gross negligence, deliberate indifference, and willful, wanton and reckless conduct. Additionally, Plaintiffs seek interest thereon from the date of the commencement of the action, even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law. *See also, supra*, Derivative-Plaintiffs' Counts for Negligent Infliction of Emotional Distress.

## COUNT VI

**Against Defendant Jane Doe, in Her Individual Capacity,
For Kyzr Willis's Grossly Negligent Wrongful Death and
His Immediately Preceding Conscious Pain and Suffering Pursuant to
Mass. Gen. Laws c. 229, §§ 2, 6 and 11**

128.   The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 127 above.

129.   Defendant Doe breached her duty of care when she deprived Kyzr Willis of the use of a

personal flotation device, which he had verbally requested, and by failing to inform her co-

workers and supervisors of Kyzr's request.  Defendant Doe further breached her duty of

care by failing to properly supervise Kyzr throughout the day.  Had Defendant Doe been

properly trained and supervised according to the provisions of Christian's Law and per

BCYF policies and procedures, Kyzr would not have been allowed to play in the ocean

unsupervised, where the tides are often strong enough to drag a child his size under water,

or where the beach drops off quickly into deeper water causing a non-swimmer or an at-

risk swimmer to venture out too deep and potentially slip under the water without notice,

and where he may not be noticed underwater or have a chance to call out for emergency

assistance.

130.   At all relevant times, Christian's Law mandated that decedent Kyzr Willis must wear a

personal flotation device.

131.   At all relevant times, Defendant Doe knew that a pervasive and unreasonable risk of serious

harm or death may result without a life jacket to a non-swimmer like Kyzr and her actions

were grossly negligent.

132.   As a direct and proximate result of the willful, wanton or reckless conduct or gross

negligence of Defendant Doe, seven-year-old Kyzr Willis suffered a terrifying and painful

drowning which ultimately resulted in his wrongful death.

133.   Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law allowable under Mass. Gen. Laws c. 229 on behalf of the Estate and statutory beneficiaries for Kyzr Willis's conscious pain and suffering and death.  Additionally, the Personal Representatives seek to recover damages to the fullest extent of the law for the fair monetary value of Kyzr Willis including, but not limited to, compensation for the loss of his reasonably expected net income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, advice of the decedent, his reasonable funeral and burial expenses, for their resulting emotional distress, and for punitive damages in an amount of not less than five thousand dollars where Kyzr's death was caused by Defendant's gross negligence, deliberate indifference, and willful, wanton and reckless conduct.  Additionally, Plaintiffs seek interest thereon from the date of the commencement of the action, even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.  *See also, supra*, Derivative-Plaintiffs' Counts for Negligent Infliction of Emotional Distress.

## COUNT VII

**Against Defendant Martin J. Walsh, in his Individual Supervisory Capacity,
For the Deprivation of Kyzr Willis's Constitutional Rights Under the Fourteenth
Amendment to the United States Constitution Pursuant to 42 U.S.C. § 1983**

134.    The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 133 above.

135.    Section 1983 provides that every person, who, under color of any statute, regulation, custom or usage, of any State subjects or causes to be subjected, any citizen or person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

136.    At all relevant times, Defendant Martin Walsh was acting in his individual capacity and under the color of law as Mayor of the City of Boston when he caused or subjected Kyzr Willis to the deprivation of his Fourteenth Amendment rights to life and liberty.

137.    At all relevant times, Defendant Walsh was responsible for establishing and implementing policies and practices to comply with relevant laws, including Mass. Gen. Laws c. 111, § 127A1/2, state regulations, and the Fourteenth Amendment to the United States Constitution, for the officials and employees of the Boston Centers for Youth and Families and the Curley Community Center in order to ensure the safety and well-being of the Boston residents they serve, most critically, the vulnerable minor non-swimmers at City of Boston recreational programs and camps that involved swimming activities in the ocean.

138.    Defendant Walsh is liable for the harm directly caused to decedent Kyzr Willis by his subordinate Jane Doe because the conduct of Jane Doe in denying Kyzr Willis the use of a girl's pink lifejacket resulted in the violation of Kyzr Willis's Fourteenth Amendment rights to life and liberty, enforced through 42 U.S.C. § 1983.

139.   In addition to the conduct of Defendant Walsh that is affirmatively linked to that of his

subordinate Doe,  so too is the conduct of Defendant Walsh affirmatively linked to that of

his subordinates Morales, Ahern, and Baker, where the cumulative or serial behavior of the

subordinates resulted in a constitutional violation affirmatively linked to Defendant

Walsh's behavior in the sense that his behavior could be characterized as supervisory

encouragement, condonation, acquiescence or gross negligence amounting to deliberate

indifference.

140.   Defendant Walsh's conduct was manifestly outrageous and conscience-shocking given that

he had earlier advocated and voted for the passage of Christian's Law, and that through the

BCYF and CCC he had later, as Mayor, represented to the parents of non-swimmers that

everything except lunch would be provided to their child while simultaneously ignoring

and failing to implement Christian's Law to provide non-swimmers like Kyzr with a life

jacket, and by hiring lifeguards and camp counselors who by their youth lacked sufficiently

mature judgment necessary to keep a large group of children (some of whom are non-

swimmers) safe at the ocean, and by a providing inadequate training and protocols and later

inadequate supervision did nothing to bolster their immature judgment and nothing to keep

that large group of children safe at the ocean.

141.   The deliberate and callous inaction by the Defendant Walsh not to implement the mandates

of Christian's Law to protect the non-swimmer campers at ocean sites, which are inherently

more dangerous than clear water pools of limited size, led directly to the death of Kyzr

Willis.  Mayor Walsh chose a policy to protect campers who swam in the City's pools by

requiring head counts of the children before they enter and after they exit the pool, buddy

systems, and accompanying children when they leave the pool, but nothing to protect campers who swam in the ocean.

142.   As a direct and proximate result of Defendant Walsh's decision not to follow the purpose and regulations promulgated by Christian's Law, the decedent, Kyzr Willis, was placed in a position of danger and vulnerability from which he was ultimately caused to suffer and die.

143.   Kyzr Willis was a known member of a small and well-defined group of vulnerable non-swimmers.

144.   As a direct and proximate result of Defendant Walsh's actions, Kyzr Willis was deprived of his constitutional rights to life and liberty interests which are protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution and, as a result, his mother, father and brother suffered financial and emotional harms.

145.   Defendant Walsh's conduct was conscience-shocking and deliberately and callously indifferent to the pervasive and unreasonable risk of drowning to death in which he placed Kyzr Willis and other young children entrusted to his care and custody at the CCC day camp.  This limited and definable group of non-swimmers at its ocean-based camps were significantly foreseeable victims of drowning and yet the Defendant Walsh did not implement Christian's Law, which mandates that children like Kyzr Willis must wear a life jacket at ocean-based camps.

146.   Christian's Law, was enacted in 2012 in response to the tragic drowning of a young boy, Christian Frechette, at a town-operated recreational program on July 13, 2007.  The Law required that the Department of Public Health adopt rules or regulations requiring municipal and recreational programs and camps for minor children to have a system in

place to have Coast Guard-approved personal flotation devices available to non-swimmers and at-risk swimmers who will be present in a swimming area (excluding artificial bodies of water). The Law further required that a determination shall be made of each minor's swimming ability at the first swimming session in order to identify and classify non-swimmers and at-risk swimmers, and that minors shall then be confined to swimming areas consistent with the limits of their swimming skills or to swimming areas requiring lesser skills than those for which they have been classified.

147. By April 2016, the Massachusetts Department of Public Health had published its Revised Interim Guidance Regarding Christian's Law in which it set forth minimum standards for programs and camps to have a system in place to have Coast Guard-approved personal flotation devices available for children in swimming areas who are non-swimmers or at-risk swimmers.

148. Defendant Walsh deprived Kyzr Willis of his Fourteenth Amendment rights to life and liberty because he was well aware of the purpose and requirements of Christian's Law before the summer of 2016 and well before Kyzr Willis suffered and died on July 26, 2016, since he had strongly advocated for Christian's Law as a state representative for the district containing the Curley Community Center; its enactment was well-publicized; and the Department of Health had published Interim Guidance on how municipalities were to comply with the Law.

149. In careless disregard for the health and safety of its non-swimmers and at-risk swimmers, Defendant Walsh ignored and did not mention or reference Christian's Law or set forth any of the provisions the Law mandated as Defendant Walsh through the City of Boston set forth its official policy or custom regarding swimming camp programs for children in

several of its BCYF and CCC publications, and in the enrollment form that the parents of Kyzr Willis would be required to sign before Kyzr could attend Defendant City of Boston's drop-in summer camp program on Carson Beach.

150. Defendant Walsh was well aware of the purpose for Christian's Law and the need to follow the Law's mandate.

151. Defendant Walsh deliberately and callously disregarded the known risk to non-swimmer children of drowning to death at its camps and recreational programs that involved water activities in lakes, ponds or oceans.

152. Defendant Walsh deliberately, repeatedly and callously did not mention or refer to Christian's Law or set forth any of the provisions mandated by the Law in the BCYF Swimming Handbook 2016, the 2016 Summer Aquatic Safety Meeting, or the Summer Youth Activities Program 2016 Rules & Regulations.

153. Defendant Walsh had a custom, pattern and practice, or policy of deliberately disregarding the requirements of Christian's Law and the safety of non-swimmer children like Kyzr Willis at its ocean-based camps such as that offered at the CCC.

154. Defendant Walsh's inaction was manifestly outrageous and conscience-shocking given that the BCYF and CCC represented to the parents of non-swimmers such as Kyzr Willis that everything except lunch would be provided to the camper while simultaneously failing to implement Christian's Law and provide each non-swimmer like Kyzr with a life jacket.

155. The deliberate and callous inaction by Defendant Walsh not to implement the mandates of Christian's Law to protect its non-swimmer campers at ocean sites, which are inherently more dangerous than clear water pools of limited size, led directly to the death of Kyzr Willis. The Defendant chose a policy to protect campers who swam in the City's pools by

requiring head counts of the children before they enter and after they exit the pool, buddy systems, and accompanying children when they leave the pool.

156.    As a direct and proximate result of Defendant's conscious decision not to follow the regulations promulgated by Christian's Law, the decedent, Kyzr Willis, was placed in a position of danger and vulnerability from which he was ultimately caused to suffer and die.

157.    As a direct and proximate result of Defendant's actions, Kyzr Willis was deprived of his constitutional rights to life and liberty interests which are protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution and, as a result, his mother, father and brother suffered financial and emotional harm.

158.    The above-described conduct of Defendant Walsh caused his subordinates William Morales, Frederick Ahern, Allison Baker, Jane Doe and others to deprive Kyzr Willis of his particular rights to life and liberty under the Fourteenth Amendment.

159.    Defendant Walsh set in motion a series of acts by his subordinates that he knew or reasonably should have known would cause the subordinates to deprive Kyzr Willis of his particular rights to life and liberty under the Fourteenth Amendment.

160.    Defendant Walsh disregarded the known or obvious consequences of his policy of ignoring Christian's Law and ignored the resulting deficient protocols, policies and methods of hiring, training and supervising his ocean-based camp counselors and lifeguards implemented by his subordinates Morales, Ahern, and Baker that would deprive Kyzr Willis of his particular rights to life and liberty under the Fourteenth Amendment.

161.    The deficiencies or omissions of Defendant Walsh's failure to implement proper protocols, policies and methods actually caused his subordinates to deprive Kyzr Willis of his particular rights to life and liberty under the Fourteenth Amendment.

162.   Defendant Walsh engaged in conduct that showed a reckless or callous indifference to the deprivation by his subordinates of the rights of others including Kyzr Willis.

163.   Defendant Walsh's conduct was so closely related to the deprivation of Kyzr Willis's rights as to be the moving force or one of the significantly moving forces that caused the ultimate injury.

164.   Defendant Walsh's conducts shocks the conscience of the community as he acted in a grossly negligent, deliberately indifferent, and willful, wanton and reckless manner.

165.   Wherefore, the Personal Representatives seek to recover damages for the Estate and statutory beneficiaries to the fullest extent of the law available under 42 U.S.C. § 1983, including compensatory and punitive damages, reasonable attorney fees, costs, and interest.

## COUNT VIII

**Against Defendant William Morales, in his Individual Supervisory Capacity,
For the Deprivation of Kyzr Willis's Constitutional Rights Under the Fourteenth
Amendment to the United States Constitution Pursuant to 42 U.S.C. § 1983**

166.    The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 165 above.

167.    At all relevant times, acting under the color of law, Defendant William Morales was responsible for the overall operation of the BCYF and the Boston community centers under its auspices, including the Curley Community Center, establishing and/or implementing the overall policies and protocols throughout the City of Boston's community centers, including the Curley Community Center, either by formal policy or by custom, and was responsible for the conduct of all the BCYF and CCC subordinate officials and employees, including Frederick Ahern, Jr., Allison Baker and Jane Doe.

168.    The actions of Ahern, Baker and Doe, as described within this complaint generally, deprived the decedent, Kyzr Willis, of his constitutional rights to life and liberty which are protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

169.    The actions and inactions of Defendant Morales are affirmatively linked to the behavior of Ahern, Baker and Doe in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference that shocks the conscience.

170.    The level of training provided to Ahern, Baker and Doe by Morales was clearly insufficient making them unfit for their jobs as no training was provided for supervising children at a recreational program offering activities in and near the ocean.  Additionally, Morales

deliberately withheld from Ahern, Baker and Doe the interim guidance from the Department of Public Health on implementing Christian's Law.

171.  Defendant Morales's conduct was so closely related to the deprivation of Kyzr Willis's rights as to be the moving force or one of the significantly moving forces that cause the ultimate injury.

172.  Defendant Morales's conduct was conscience-shocking as he knew that Kyzr Willis was a potential victim of a limited and definable group of ocean non-swimmers as identified by Christian's Law, which mandates that all non-swimmers at the ocean in a municipal camp or program wear a life jacket, and Morales was deliberately indifferent to the risk to Kyzr and his limited group of ocean non-swimmers. He acted in a grossly negligent, deliberately indifferent, and willful, wanton and reckless manner.

173.  Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law available under 42 U.S.C. § 1983, including compensatory and punitive damages, reasonable attorney fees, costs, and interest, on behalf of the Estate and statutory beneficiaries.

## COUNT IX

**Against Defendant Frederick B. Ahern, Jr., in his Individual Supervisory Capacity,
For the Deprivation of Kyzr Willis's Constitutional Rights Under the Fourteenth
Amendment to the United States Constitution Pursuant to 42 U.S.C. § 1983**

174.   The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 173 above.

175.   At all relevant times the Defendant Frederick Ahern, Jr. was employed by the City of
       Boston and acting under color of law.

176.   At all relevant times, Defendant Ahern's conduct was affirmatively linked to Allison
       Baker's and Jane Doe's conduct that caused Kyzr Willis to be deprived of his rights to life
       and liberty under the Fourteenth Amendment in the sense that Defendant Ahern's conduct
       could be characterized as supervisory encouragement, condonation, acquiescence or gross
       negligence amounting to deliberate indifference to the life and liberty of Kyzr Willis and
       for Baker's and  Doe's similar indifference to Kyzr's life and liberty.

177.   At all relevant times, Defendant Ahern acted in a deliberate or recklessly indifferent
       manner to Kyzr Willis's life and liberty by failing to implement any of the safety
       precautions for non-swimmers that were required by Christian's Law. He also failed to
       establish and implement basic common sense safety precautions, which the director of a
       drop-in summer camp program on the ocean might reasonably establish when a number of
       the young campers in attendance were non-swimmers. Defendant Ahern further failed to
       instruct his subordinate summer program supervisor to then instruct her subordinate
       lifeguards and camp counselors about these protocols, which ultimately was the direct and
       proximate causal link to Kyzr Willis's death.

178.   At all relevant times, Defendant Ahern's deliberate conduct not to follow or implement the
       policies and procedures mandated by Christian's Law so that his subordinate Summer

Program Supervisor Baker could instruct and supervise her subordinate lifeguards and camp counselors including Jane Doe is affirmatively linked to Baker and Doe depriving Kyzr Willis of his constitutional rights to life and liberty.

179.   Defendants Baker and Doe actually deprived Kyzr of his constitutional rights to life and liberty thereby causing his suffering and death.

180.   As a direct and proximate result of Defendant Ahern's conscious and deliberate decision not to follow Christian's Law or the regulations promulgated thereafter by the Massachusetts Department of Public Health, Defendant Ahern callously and recklessly placed the decedent, Kyzr Willis, in a position of danger and vulnerability that ultimately caused him to suffer and die.

181.   At all relevant times, Defendant Ahern objectively and subjectively knew that a pervasive and unreasonable risk of serious harm or death may result to a non-swimmer like Kyzr Willis and he remained deliberately or recklessly indifferent to his life and liberty.

182.   At all relevant times, Defendant Ahern knew that lunch was the only thing decedent's parents were obligated to provide for him while he was away from them at camp.

183.   Defendant Ahern failed to protect Kyzr Willis while simultaneously giving his parents and brother a false sense of care and safety while he was entrusted to Defendant Ahern.

184.   Defendant Ahern's conduct was so closely related to the deprivation of Kyzr Willis's rights as to be the moving force or one of the significantly moving forces that cause the ultimate injury.

185.   At all relevant times, Defendant Ahern's conduct shocks the conscience or offends the community's sense of fair play and decency. He acted in a grossly negligent, deliberately indifferent, and willful, wanton and reckless manner.

186.   As a direct and proximate result of Defendant Ahern's conduct, decedent suffered great physical and emotional harm and loss of life and economic damage.

187.   Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law available under 42 U.S.C. § 1983, including compensatory and punitive damages, reasonable attorney fees, costs, and interest, on behalf of the Estate and statutory beneficiaries.

<u>COUNT X</u>

**Against Defendant Allison Baker, in her Individual Supervisory Capacity,
For the Deprivation of Kyzr Willis's Constitutional Rights Under the Fourteenth
Amendment to the United States Constitution Pursuant to 42 U.S.C. § 1983**

188.    The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 187 above.

189.    At all relevant times, Defendant Allison Baker was acting within the scope of her City of
        Boston employ and under color of law as the Curley Community Center's Summer
        Program Supervisor.

190.    At all relevant times when Defendant Baker was engaged in training and supervising her
        subordinate camp counselors and lifeguards, Defendant Baker callously and recklessly
        disregarded what she knew or should have known were the obvious consequences of her
        training deficiencies about the purpose and mandates of Christian's Law, the inherent
        dangers that ocean water presents to non-swimmers, and common methods to ameliorate
        these risks and dangers such as taking frequent head counts and taking head counts
        immediately upon exiting the ocean, establishing buddy systems with campers of like
        swimming ability, assigning specific counselors to closely monitor a specific and small
        number of campers at all times, mandating that all non-swimmers must wear life jackets
        when in the ocean or on the beach, instructing lifeguards and counselors to be mindful and
        cautious of strong tides or large waves, and implementing an obvious method for
        identifying non-swimmers.

191.    At all relevant times when Defendant Baker was engaged in supervising her subordinate
        camp counselors and lifeguards, Defendant Baker callously and recklessly disregarded
        what she knew or should have known were the obvious consequences of her supervision
        deficiencies that failed to ensure that her subordinate camp counselors and lifeguards made

sure that non-swimmers wore life jackets and that the non-swimmers were being constantly and closely monitored in and out of the water.

192. Defendant Baker's deficient training and supervision of her subordinate lifeguards and camp counselors rendered them unfit for their jobs and actually caused camp counselor Jane Doe to violate decedent Kyzr Willis's constitutional rights to life and liberty by not providing him with a life jacket before he engaged in activities in and near the ocean and by not closely watching him at all times.

193. As a direct and proximate result of Defendant Baker's deficient training and supervision of her subordinate lifeguards and camp counselors including Jane Doe, no one knew that Kyzr was missing until his nine-year-old brother Ralph Jr. reported Kyzr's absence toward the end of the camp day and no one knew where Kyzr was until the police found him dead at the bottom of the ocean in about 10 feet of water close behind the CCC.

194. At all relevant times, Defendant Baker showed a callous and reckless disregard for her campers, and particularly, for Kyzr's safety and well-being. Defendant Baker's deficient training and supervision of her subordinates was closely linked to Jane Doe's conduct that actually caused decedent Kyzr Willis to be deprived of his well-established rights to life and liberty arising under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

195. At all relevant times, Defendant Baker objectively and subjectively knew that a pervasive and unreasonable risk of serious harm or death may result to a non-swimmer like Kyzr Willis and she remained deliberately or recklessly indifferent to his life and liberty.

196. At all relevant times, Defendant Baker knew that lunch was the only thing decedent's parents were obligated to provide to him while he was at camp away from them.

197. Defendant Baker failed to protect Kyzr Willis while simultaneously giving his parents and brother a very false sense of care and safety while he was entrusted to her.

198. Defendant Baker's conduct was so closely related to the deprivation of Kyzr Willis's rights as to be the moving force or one of the significantly moving forces that cause the ultimate injury.

199. At all times relevant, Defendant Baker's conduct shocks the conscience or offends the community's sense of fair play and decency. She acted in a grossly negligent, deliberately indifferent, and willful, wanton and reckless manner.

200. As a direct and proximate result of Defendant Backer's conduct, decedent suffered great physical and emotional harm, loss of life, and economic damage.

201. Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law available under 42 U.S.C. § 1983, including compensatory and punitive damages, reasonable attorney fees, costs, and interest, on behalf of the Estate and statutory beneficiaries.

## COUNT XI

**Against Defendant Jane Doe, in her Individual Capacity,**
**For the Deprivation of Kyzr Willis's Constitutional Rights Under the Fourteenth**
**Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983**

202.   The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 201 above.

203.   By the actions described more fully above, Defendant Jane Doe deprived decedent Kyzr

Willis of his well-established rights to life and liberty arising under the Due Process Clause

of the Fourteenth Amendment to the United States Constitution, which are enforced under

42 U.S.C. § 1983, and she did so in her individual capacity, while acting under color of

law and within the scope of her employ by the City of Boston as a summer camp counselor

at the Curley Community Center.

204.   Defendant Doe violated Kyzr Willis's rights to liberty and life when Defendant Doe

deprived him of a life jacket while knowing that she was not going to watch him all day,

that he would at best be watched sporadically by other camp counselors and lifeguards who

also had to watch over more than 50 other minor children, and that he was a non-swimmer

who was going to play in the ocean where the tides can be strong enough to drag him under

water, and where the beach drops off quickly into deeper water causing him to

inadvertently venture out too deep and slip under the water without notice, and where he

may not be noticed or have a chance to call out for help.

205.   At all relevant times, Christian's Law mandated that decedent Kyzr Willis must wear a life

jacket.

206.   At all relevant times, Defendant Doe objectively and subjectively knew that a pervasive

and unreasonable risk of serious harm or death may result to a non-swimmer like Kyzr and

she remained deliberately or recklessly indifferent to his life and liberty.

207.   At all relevant times, Defendant Doe knew that lunch was the only thing decedent's parents were obligated to provide Kyzr Willis while he was at camp away from them and in the custody and control of his camp counselors and lifeguards.

208.   At all relevant times, Defendant Doe's conduct shocks the conscience and offends the community's sense of fair play and decency and Defendant Doe acted in a grossly negligent, deliberately indifferent, and willful, wanton and reckless manner.

209.   As a direct and proximate result of Defendant Doe's conduct, Kyzr Willis suffered great physical and emotional harm, loss of life, and economic damage.

210.   Wherefore, the Personal Representatives seek to recover damages to the fullest extent of the law available under 42 U.S.C. § 1983, including compensatory and punitive damages, reasonable attorney fees, costs, and interest, on behalf of the Estate and statutory beneficiaries.

<u>COUNT XII</u>

**Against All Defendants in Their Individual and Official Capacities
For the Emotional Distress Suffered by
Melissa Willis, Ralph Toney, and Ralph Toney, Jr.**

211.　The Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 210 above.

212.　Defendants' wrongful acts and omissions resulted in Kyzr Willis's conscious suffering and death.

213.　As a direct and proximate result, Derivative-Plaintiffs' Melissa Willis, Ralph Toney, and Ralph Toney, Jr., as bystanders, suffered emotional distress and physical harm.

214.　Derivative-Plaintiffs have a close familial relationship with decedent-Kyzr Willis. Melissa Willis is his mother, Ralph Toney is his father, and Ralph Toney, Jr. is his brother.

215.　Derivative-Plaintiff Ralph Jr. was at the scene of the incident while the injury was being inflicted upon his brother, Kyzr Willis.

216.　Soon after the injuries were suffered by Kyzr Willis, Derivative-Plaintiffs Melissa Willis and Ralph Toney heard about the incident and each rushed to the scene.

217.　For reasons that were unknown to the Derivative-Plaintiffs, Boston Police would not allow them to see or later identify Kyzr's dead body.

218.　As bystanders, the Derivative-Plaintiffs suffered the shock of witnessing the incident and/or the immediate aftermath of the incident.

219.　They were in close proximity to the scene of Kyzr's death and were present when Kyzr was missing and later when his body was found.

220.　They experienced shock, sleeplessness and nightmares, anxiety, nausea and loss of appetite, sweating, headaches, depression and sadness, crying, fainting or near-fainting, and other ailments. Their emotional distress and many of these ailments continue.

221.   Ralph Willis, Jr. continues to ask himself what he could have done to help his little brother, what could he have done differently to keep Kyzr from downing and dying, how to make his brother come back, and he suffers survivor's remorse.

222.   Melissa Willis and Ralph Toney continue to ask themselves what they could have done differently to keep Kyzr from drowning and dying.

223.   As a direct and proximate result of Defendants' wrongful conduct that caused personal injuries to Kyzr Willis, Derivative-Plaintiffs suffered emotional distress manifest by objectives symptoms of physical harm.

224.   Wherefore, Plaintiffs and Derivative-Plaintiffs are entitled to relief, and damages are sought to the fullest extent allowed by law including compensation for the emotional harms they suffered, their past and future medical expenses arising from their emotional suffering, lost wages, loss of earning capacity, and loss of consortium.

## RELIEF REQUESTED

WHEREFORE, the Personal Representatives of the Estate of Kyzr Lee Willis, on behalf

of the Estate and the individual statutory beneficiaries, and together with the Derivative-Plaintiffs,

request this Honorable Court to order Defendants, jointly and severally, to pay:

    A.  Compensatory damages in the greatest amount supported by the law and evidence;

    B.  Special, punitive or exemplary damages to the fullest extent allowed by law;

    C.  Interest, costs and reasonable attorneys' fees; and,

    D.  Such further relief as is fair and just.

Plaintiffs respectfully demand a trial by jury on all issues so triable.

Respectfully Submitted:

Melissa Willis and Ralph Toney, Individually
And as Personal Representatives of the Estate of
Kyzr Lee Willis, and Ralph Toney, Jr.
PLAINTIFFS
By their Attorneys:

Vikas S. Dhar, BBO No. 657539
vikas@dharlawllp.com
Robert M. Griffin, BBO No. 553893
rgriffin@dharlawllp.com
DHAR **LAW** llp

One Constitution Center, Suite 300
Charlestown, Massachusetts 02129
Tel: (617) 880-6155
Fax: (617) 880-6160

Date: September 20, 2017