UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:17-cv-11815-JCB

MELISSA WILLIS AND RALPH TONEY, INDIVIDUALLY AND AS THE PERSONAL REPRESENTATIVES OF THE ESTATE OF KYZR LEE WILLIS; AND RALPH TONEY, JR.
  Plaintiffs,

v.

CITY OF BOSTON; MARTIN J. WALSH, MAYOR OF BOSTON; WILLIAM MORALES, BOSTON CENTER FOR YOUTH AND FAMILIES COMMISSIONER; FREDERICK B. AHERN, JR., CURLEY COMMUNITY CENTER DIRECTOR AND ADMINISTRATIVE COORDINATOR; ALLISON BAKER, CURLEY COMMUNITY CENTER SUMMER PROGRAM SUPERVISOR; JANE DOE, CURLEY COMMUNITY CENTER CAMP COUNSELOR
  Defendants.

**DEFENDANT MARTIN J. WALSH'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS**

**I.   INTRODUCTION**

Plaintiffs' Complaint[1] alleges that on July 26, 2016, the decedent, Kyzr Lee Willis, drowned at a day camp operated by the City of Boston. According to the Plaintiffs, Kyzr was not properly supervised and was not provided with a life jacket, ultimately leading to his death. Plaintiffs filed suit against Mayor Martin J. Walsh ("Mayor Walsh"), the City of Boston

---

[1] Plaintiffs Melissa Willis and Ralph Toney file suit in their individual capacities and as personal representatives of the estate of decedent Kyzr Lee Willis. Ralph Toney, Jr. is named as a "Derivative-Plaintiff." Ralph Toney, Jr. is not an appropriate plaintiff because he is a minor child. See Fed. R. Civ. P. 17(c). As a result, his claims must be dismissed.

("City"), and various camp employees.  Plaintiffs assert three claims against Mayor Walsh:  a negligence claim (Count II), a Fourteenth Amendment substantive due process claim (Count VII), and an emotional distress claim[2] (Count XII).  Plaintiffs' negligence claim fails because it is barred pursuant to the Massachusetts Tort Claims Act ("MTCA").  Plaintiffs' Fourteenth Amendment claim fails because these allegations, while tragic, do not implicate the *constitutional* right to substantive due process.  Rather, in keeping with the Supreme Court's repeated admonition that not all torts implicate due process, Plaintiffs' claim, if any, arises under state law.[3]

## II.  FACTUAL BACKGROUND[4]

In the summer of 2016, the City operated a drop-in camp at the Curley Community Center in South Boston.[5]  (Complaint "Compl." ¶ 20).  The camp permitted children to play and swim in the ocean behind the Curley Community Center.  (Compl. ¶ 21).  The camp advertised that it would provide supervision to the campers.  (Compl. ¶ 24).  Kyzr, then seven years old, attended the camp on July 26, 2016.  (Compl. ¶ 20).  That day, Kyzr, along with 55 other children, were supervised by three lifeguards and 19 camp counselors.  (Compl. ¶ 22).  Many of the camp counselors were teenagers.  (Compl. ¶ 22).  It was well-known by the lifeguards and camp counselors that Kyzr did not know how to swim.  (Compl. ¶¶ 26-27).

Christian's Law, enacted on July 12, 2012, "mandated that Coast Guard-approved personal flotation devices be made available to all non-swimmers and at-risk swimmers at

---

[2]  Plaintiffs do not indicate whether this claim is for *negligent* infliction of emotional distress or *intentional* infliction of emotional distress.  Regardless, both claims fail as a matter of law.

[3]  The City of Boston is not moving to dismiss the negligence claim brought against it.

[4]  The following facts are accepted as true for the limited purpose of this motion only.

[5]  Mayor Walsh disputes this fact.  The camp was operated by the Curley Community Center Site Counsel, *not* the City.

programs or camps that conduct swimming activities at marine or freshwater beaches." (Compl. ¶ 55). The City did not mention Christian's Law in any of its rules or regulations pertaining to the camp. (Compl. ¶ 64).

Kyzr asked one of the camp counselors for a life jacket. (Compl. ¶ 29). The camp counselor responded that "only pink ones for girls [were] available" and Kyzr was not given a life jacket. (Compl. ¶ 29). Kyzr was not forced to wear a lifejacket as he played in the ocean. (Compl. ¶ 30). At approximately 2:15 p.m., the camp director signaled to the lifeguards and camp counselors to clear the campers from the water and to send them to the locker room to get changed for dismissal. (Compl. ¶ 31). At 2:30 p.m., the three lifeguards reported that the beach was clear of all swimmers and walked off the beach. (Compl. ¶ 35). At some point between 2:15 and 2:30 p.m., while he was getting ready to go home, Kyzr's brother, Ralph Toney, Jr., alerted a camp counselor that Kyzr was missing. (Compl. ¶ 39).

The camp director thereafter commenced a "panicked" search for Kyzr in the Curley Community Center. (Compl. ¶ 40). After searching the building, camp counselors searched the surrounding land and streets. (Compl. ¶ 41). At 2:40 p.m., the lifeguards commenced a water search. (Compl. ¶ 42). At 2:49 p.m., a City employee called 911. (Compl. ¶¶ 48-49). At 2:53 p.m., Boston police arrived on scene to aid in the search. (Compl., ¶ 50). The efforts to find Kyzr were complicated by conflicting information provided by witnesses on scene, many of whom were children. (Compl. ¶ 38). At 6:00 p.m., the police picked up an underwater image of Kyzr's body on sonar. (Compl. ¶ 51). Boston police retrieved Kyzr's body from the water and he was pronounced dead just before 7:10 p.m. (Compl. ¶ 52).

## III. STANDARD OF REVIEW

To survive a motion to dismiss, a complaint "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine "whether a complaint states a plausible claim, [courts] 'perform [a] two-step analysis.'" Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Cardigan Mtn. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015)). "At the first step, we distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Id. (internal quotation marks omitted). "At step two, we must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable." Id. (internal quotation marks omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations are true . . . ." Twombly, 550 U.S. at 555. This standard is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555.

## IV. ARGUMENT

### A. PLAINTIFFS' NEGLIGENCE CLAIMS AGAINST MAYOR WALSH IN HIS INDIVIDUAL CAPACITY MUST BE DISMISSED BECAUSE NEGLIGENCE CLAIMS AGAINST MUNICIPAL EMPLOYEES ARE BARRED BY THE MASSACHUSETTS TORT CLAIMS ACT.

In Count II of their Complaint, Plaintiffs assert a "grossly negligent wrongful death" claim pursuant to G. L. c. 229, § 2 against Walsh in his individual capacity. Plaintiffs assert that Walsh, "in a grossly negligent manner, failed to order the implementation of the provisions of Christian's Law," ultimately leading to Kyzr's death. (Compl. ¶ 93). This claim fails because 1)

4

Plaintiffs cannot bring a wrongful death claim under G. L. c. 229 against Walsh under the facts alleged that is separate and distinct from their G. L. c. 258 claim; see Hallett v. Town of Wrentham, 398 Mass. 550, 553 (1986) (holding that the $100,000 limitation imposed by G. L. c. 258, § 2 applies to all claims comprised by the wrongful death statute, G. L. c. 229, § 2); and 2) G. L. c. 258, the Massachusetts Tort Claims Act ("MTCA"), bars any negligence claim against Walsh.

      G. L. c. 258, § 2 provides in relevant part:

> Public employers shall be liable for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment…*and no such public employee or the estate of such public employee shall be liable for any injury or loss of property or personal injury **or death** caused by his negligent or wrongful act or omission while acting within the scope of his office or employment….*

(emphasis added). Mayor Walsh is a "public employee" under G. L. c. 258, § 1 because he is an elected official of a "public employer," i.e., the City, as defined in that same section. According to the Plaintiffs, Walsh was acting within the scope of his employment at all times relevant to their Complaint. (Compl. ¶ 7). As a result, the City, as Walsh's public employer, is the sole entity answerable for any negligence claim—including any wrongful death claim—asserted against Mayor Walsh.[6]  See Maraj v. Massachusetts, 836 F. Supp. 2d 17, 31 (D. Mass. 2011) (recognizing that the MTCA precludes wrongful death claims that sound in negligence against public employees); Caisse v. DuBois, 346 F.3d 213, 218 (1st. Cir. 2003) ("Negligence claims against [municipal employees] in their individual capacities are barred because the Tort Claims

---

[6]    Casting their claim as one for "gross" negligence, as opposed to ordinary negligence, does not permit the Plaintiffs to avoid the ramifications of the MTCA.  See Farrah ex rel. Estate of Santana v. Gondella, 725 F. Supp. 2d 238, 246 n. 9 (D. Mass. 2010) (noting that for purposes of [Mass. Gen. Laws c. 258 immunity], "recklessness is considered negligent, rather than intentional conduct") (quoting Parker v. Chief Justice for Admin. & Mgmt. of the Trial Court, 67 Mass. App. Ct. 174, 180 (2006)).

Act shields public employees from personal liability for negligent conduct."). As a result, Walsh is immune from liability for the wrongful death claim asserted in Plaintiffs' Complaint.

Plaintiffs' negligent infliction of emotional distress claim fares no better. In Count XII, Plaintiffs allege that, as bystanders, they suffered "emotional distress and physical harm." (Compl. ¶ 213). However, public employees are immune from liability for negligent infliction of emotional distress claims under the MTCA for the same reasons discussed above. See Wilmot v. Tracey, 938 F. Supp. 2d 116, 144 (D. Mass. 2013) (dismissing negligent infliction of emotional distress claims against individual state employees).

Because Plaintiffs' negligence claims against Mayor Walsh are barred by the MTCA, and because Plaintiffs may not assert a wrongful death claim that is separate and distinct from their negligence claims, Counts II and XII must be dismissed.

> 1. **There Are No Allegations To Support An Intentional Infliction Of Emotional Distress Claim Against Mayor Walsh.**

Count XII does not indicate whether it is a *negligent* infliction of emotional distress claim or an *intentional* infliction of emotional distress ("IIED") claim. However, to the extent Count XII alleges an IIED claim against Mayor Walsh, it fails as a matter of law.

"The standard for making a claim of intentional infliction of emotional distress is very high." Polay v. McMahon, 468 Mass. 379, 385 (2014) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st. Cir. 1996)). "To state a claim for intentional infliction of emotional distress, [Plaintiffs] must show (1) that [Walsh] "intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct[,] (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community[,]" (3) that [Walsh's] actions caused the [Plaintiffs']

distress, and (4) that the [Plaintiffs'] emotional distress was severe." Wilmot, 938 F. Supp. 2d at 144 (citing Howell v. Enter. Publ'g Co., LLC, 455 Mass. 641, 672 (2010)).

Plaintiffs do not allege any such conduct. Plaintiffs do not allege that Walsh was present on scene or had any involvement with the incident. Plaintiffs do not allege that Walsh had any involvement with the day-to-day operations of the camp. Rather, Plaintiffs premise their IIED claim against Walsh on the allegation that he failed to implement Christian's Law and otherwise failed to ensure that the camp was appropriately staffed and supervised. (Compl. ¶¶ 61-71).

A defendant's failure to do something is generally insufficient to state a claim for IIED because a failure to do something is not considered "extreme and outrageous" or "utterly intolerable in a civilized community." See Morgan v. Town of Lexington, 138 F. Supp. 3d 82, 94 (D. Mass. Sep. 24, 2015) (reviewing Massachusetts case law and dismissing IIED claim premised upon employee's failure to prevent bullying); see also Galvin v. U.S. Bank, N.A., 852 F.3d 146, 161 (1st Cir. 2017) (noting that defendant's failure to follow its own policies did not give rise to IIED claim); Doe v. Bradshaw, No. 11-11593, 2013 WL 5236110, at *13 (D. Mass. Sept. 16, 2013) (holding school officials' investigation of high school coach's sexual misconduct with students, while "on the border of 'deliberate indifference' or 'intentional discrimination,'" was insufficiently extreme and outrageous).

Because the allegations against Walsh are that he failed to do something, i.e., that he failed to implement Christian's Law and that he otherwise failed to ensure that the camp was properly staffed and supervised, Plaintiffs fail to state an IIED claim against Walsh because this conduct is not "extreme and outrageous" or "utterly intolerable in a civilized community" under Massachusetts law. Moreover, Plaintiffs fail to allege that Walsh acted in the "targeted and malicious manner" that is typically required to meet the high bar of an IIED claim, even at the

motion to dismiss stage.  See Henriquez v. City of Lawrence, 2015 WL 3913449, *5 (D. Mass. Jun. 25, 2015) (citing Rua v. Glodis, 52 F. Supp. 3d 84, 100 (D. Mass. Sep. 24, 2014)).  As a result, Count XII, to the extent it alleges an IIED claim, must be dismissed.

> **B.    PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM AGAINST MAYOR WALSH IN HIS INDIVIDUAL CAPACITY FAILS BECAUSE PLAINTIFFS HAVE NOT ALLEGED A SUBSTANTIVE DUE PROCESS VIOLATION AND, EVEN IF THEY DID, MAYOR WALSH WAS NOT RESPONSIBLE FOR IT.**

In Count VII of their Complaint, Plaintiffs bring a Fourteenth Amendment substantive due process claim against Mayor Walsh in his "individual supervisory capacity."

"Supervisory officials may be liable under § 1983 for the conduct of their subordinate only if (1) the behavior of the subordinate 'results in a constitutional violation,' and (2) the supervisors' actions or inactions were 'affirmative[ly] link[ed] to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference.'"  Hernandez v. City of Boston, 2017 WL 1496920, at *5 (D. Mass. Apr. 25, 2017) (citing Estate of Bennett v. Wainwright, 548 F.3d 155, 176-77 (1st. Cir. 2008)).  Plaintiffs' Complaint does not sufficiently allege either element.  First, Plaintiffs have not stated a substantive due process violation; at most, Plaintiffs' Complaint alleges negligence.  Second, even if Plaintiffs have alleged a constitutional violation, Mayor Walsh was not responsible for it.

> **1.    Plaintiffs Have Not Alleged A Substantive Due Process Violation Because There Was No Conscience-Shocking Conduct.**

Plaintiffs appear to advance two theories of liability under the Fourteenth Amendment: 1) that the Federal Constitution imposes a duty on municipal employees to provide children at their summer camps with minimum levels of safety and security; or 2) that the city employees' "deliberate indifference" to Kyzr's safety, by failing to enact Christian's Law and other policies,

8

was conscience-shocking. (Compl. ¶¶ 138-141). The Supreme Court has already rejected both of these arguments. See DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 195 (1989) (holding that government's failure to provide minimum levels of safety and security cannot give rise to substantive due process claim); Collins v. City of Harker Heights, 503 U.S. 115, 115 (1992) (holding that government's failure to implement certain policies and abide by state law cannot give rise to substantive due process claim).

To preserve the distinction between state tort law and constitutional due process violations, a substantive due process claim demands conscience-shocking conduct. "The substantive due process guarantee does not, however, serve as a means of constitutionalizing tort law so as to 'impos[e] liability whenever someone cloaked with state authority causes harm.'" Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998)). Instead, "[s]ubstantive due process is a constitutional cause of action that leaves the door 'slightly ajar for federal relief in truly horrendous situations.'" Clark v. Boscher, 514 F.3d 107, 112-12 (1st Cir. 2008) (quoting Néstor Colón-Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992)).

When considering alleged substantive due process violations, the Supreme Court has stated that "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis, 523 U.S. at 848 n.8. Importantly, "negligently inflicted harm is 'categorically beneath the threshold' of a constitutional violation." Ramos-Piñero v. Puerto Rico, 453 F.3d 48, 53 (1st. Cir. 2006) (quoting Lewis, 523 U.S. at 849); see Daniels, 474 U.S. at 328 ("[T]he Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty or property.") (emphasis in original). Conversely, conduct most likely to be

9

conscience-shocking is conduct that is "intended to injure in some way unjustifiable by any government interest." Lewis, 523 U.S. at 849. Put another way, "[o]utside of a few narrow categories . . . this means conduct that is truly outrageous, uncivilized, and intolerable." Hasenfus v. LaJeunesse, 175 F.3d 68, 73 (1st. Cir. 1999). As the First Circuit has explained, "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior *may* suffice to shock the conscience." Rivera, 402 F.3d at 36 (emphasis added; quotations omitted). That being said, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." Lewis, 523 U.S. at 850. Overall, then, conscience-shocking conduct exhibits "an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." González-Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010) (internal alterations and quotation marks omitted).

In DeShaney, a young child was beaten and permanently injured by his father, with whom he lived. DeShaney, 489 U.S. at 191. The plaintiffs sued the Department of Social Services and various local officials on grounds that they were deliberately indifferent to the child's needs because they knew the child was being abused but did nothing to remove the child from his father's custody. Id. Plaintiffs argued that even if the Constitution does not require the government to provide the *general public* with minimum levels of safety and security, it does require the government to provide persons with whom it has a "special relationship" with minimum levels of safety and security. DeShaney, 489 U.S. at 197. Plaintiffs argued that a "special relationship" existed in their case because the government knew the child was being

10

abused by his father and "specifically proclaimed, by word and deed, its intention to protect him against that danger" by assembling a Child Protection Team, visiting his home, and monitoring his case, among other things.  Id. at 192, 197.  The Supreme Court rejected their argument, noting that the only time the Constitution imposes upon the government a duty to assume responsibility for a person's safety and well-being is when the "State takes a person into its custody and holds him there *against his will*[.]"  Id. at 200.  To that end, the Supreme Court has recognized the possibility of a substantive due process violation in the context of the government's failure to provide adequate medical care to incarcerated prisoners and involuntarily committed mental patients.  See Robinson v. California, 370 U.S. 660 (1962); Youngsberg v. Romeo, 457 U.S. 307, 314-325 (1982).  "The rationale for this principle is simple enough:  when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs…it transgresses the substantive limits on state action set by…the Due Process Clause."  DeShaney, 489 U.S. at 200 (citing Estelle v. Gamble, 429 U.S. 97, 103-104 (1976)).  Significantly, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means."  DeShaney, 489 U.S. at 200.  Because the state officials had no obligation to provide minimum levels of safety and security to the child, the plaintiffs' substantive due process claim failed.

In Collins, a sanitation department worker died while working in a manhole from asphyxiation by sewer gas.  The plaintiff alleged that the city was deliberately indifferent

11

because it knew of the danger but failed to provide training, warnings, or proper equipment to its employees. Collins, 503 U.S. at 117-18. The plaintiff underscored that the equipment and training were required by state law. Id. at 118. Even if, as alleged, the city was deliberately indifferent to those risks, the Supreme Court determined that the city's policy choices were not conscience-shocking. Id. at 128. The Supreme Court presumed "that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces," id., and maintaining public works "involve[s] a host of policy choices," id. at 129. The allegation that the city was not compliant with state law did not change the analysis because, according to the Supreme Court, the city's failures or omissions did not amount to a constitutionally arbitrary deprivation of the decedent's life. Id. Overall, the Due Process Clause did not require the city to "provide its employees with certain minimal levels of safety and security." Id. at 127.[7] In short, the Supreme Court concluded that the claim was "analogous to a fairly typical state-law tort claim" that did not rise to constitutional due process dimensions. Id. at 128.

Similarly, in Ramos-Piñero, 453 F.3d at 50, a student fell through an open manhole that had been obscured by flood water and ultimately drowned. The complaint claimed that the municipality violated the plaintiff's substantive due process rights under the Fourteenth Amendment by "fail[ing] to devote sufficient resources to the design and maintenance of their sewer and highway systems, resulting in flooding and the failure to cover an open manhole" despite the municipality's knowledge of the potential "tragic consequences" of this omission. Id. at 53. In affirming dismissal of the complaint, the First Circuit explained, relying on Collins, that there was no conscience-shocking conduct. Id. at 55. In reaching this conclusion, the First

---

[7] The Collins Court suggested that the same analysis would apply to non-employee individuals served by the government. 503 U.S. at 119-20.

Circuit emphasized that "[l]ocal governments must decide the appropriate level of resources, which are necessarily limited, to devote to those works" and that "[g]overnment actors must also determine, as a policy matter, how to make these decisions and what resources to devote to assessing the various competing needs." Id. at 54.

Finally, in DeAnzona v. City and County of Denver, 222 F.3d 1229, 1236 (10th Cir. 2000), the Tenth Circuit rejected a substantive due process claim based on facts nearly identical to the ones alleged here. In that case, a camper at a municipal day camp wandered away and drowned. The Tenth Circuit found that the camp's failure to monitor the child was arguably negligent, but not conscience-shocking. Id. at 1236. Moreover, the camp's failure to enact certain policies—including not clearly defining the jobs of counselors, not requiring that children at the camp know how to swim, and not having a system in place to identify the location of any child at any time—did not rise to the level of deliberate indifference. Id. "This affair, while tragic, is not a constitutional violation, but, as the district court stated, a negligence case." Id.

Here, as in DeShaney, Collins, Ramos-Piñero, and DeAnzona, the Court should dismiss Plaintiffs' substantive due process claim because there are no allegations of conscience-shocking conduct by any city employee. Primarily, there are no allegations that any employee intended to harm the decedent. See Lewis, 523 U.S. at 849 (conduct "intended to injure in some way unjustifiable by any government interest" is most likely to be conscience-shocking). Rather, the Complaint summarily labels the employees' conduct as "grossly negligent, deliberately indifferent, and willful, wanton and reckless[.]" (Compl. ¶ 164.) None of these categories implicate intentional conduct.

Rather than allege intentional conduct, Plaintiffs resort to listing a number of ways in which City employees exhibited deliberate indifference to the decedent's needs. (See Compl. ¶

138-139). But merely labeling conduct "deliberately indifferent" is not sufficient to state a claim. In general, the First Circuit has noted that while deliberately indifferent conduct *may* shock the conscience, that determination heavily depends on the circumstances of the case. See Rivera, 402 F.3d at 36. Taking account of the specific circumstances of this case, DeShaney, Collins, and Ramos-Piñero all rejected substantive due process claims against municipalities in the context of ensuring minimum levels of safety and security. Collins, Ramos-Piñero, and DeAnzona also rejected a substantive due process claim based on a city's failure to follow state law and adopt certain policies. The allegations here with respect to the city employees' responsibilities towards the decedent are no different.

Here, neither the City nor any of its employees were required, under the Federal Constitution, to provide the decedent with minimum levels of safety and security. See DeShaney, 489 U.S. at 200. A "special relationship" between the decedent and the City was not created by virtue of the decedent's voluntary attendance at a drop-in, city-run day camp. Id. The decedent was not deprived of his liberty, in a constitutional sense, because he was not incarcerated, institutionalized, or otherwise held against his will in a manner contemplated by the substantive due process clause. Id. Under these facts, pursuant to DeShaney, the City was not required to provide the decedent with minimum levels of safety or security.

In Collins, the Supreme Court stated that the municipality's alleged failure to implement certain safety procedures was not arbitrary in a constitutional sense because it rested on "a rational decisionmaking process that takes account of social, political, and economic forces." 503 U.S. at 128. Decisions concerning the "particular aspects" of government programs, "such as the training and compensation of employees, involve a host of policy choices . . . ." Id. at 129. Moreover, the municipality's failure to follow state law in terms of providing safety training and

14

protective equipment to minimize known dangers was not "arbitrary in the constitutional sense." Id. As Collins pointed out, "[t]he Due Process Clause 'is not a guarantee against incorrect or ill-advised personnel decisions.'" Id. at 129 (quoting Bishop v. Wood, 426 U.S. 341, 350 (1976)). This thought-process was echoed by the First Circuit in Ramos-Piñero.

The same is true here. The City and its employees decided how to allocate limited resources for its summer camps; for the hiring, training, and supervision of its employees; for the development of policies; and for ensuring compliance with those policies. Indeed, the Complaint alleges that the City failed to mention Christian's Law "in its BCYF Swimming Handbook 2016, [in its] 2016 Summer Aquatic Safety Meeting, [in its] Summer Youth Activities Program 2016 Rules and Regulations…or in any of the documents it required Kyzr's parents to sign before their son could participate in the City of Boston's BCYF summer drop-in program." (Compl. ¶ 64). These allegations demonstrate that the City *had* policies in place and was not deliberately indifferent to the risks of operating a summer camp.

Likewise, there are no allegations that any City employee knew of, but disregarded, problems with its existing policies. In Collins, it was alleged that the city was *specifically* on notice that its failure to comply with state law by failing to provide its employees with certain safety equipment and training was problematic because plaintiff's supervisor was rendered unconscious in a manhole just several months prior to plaintiff's incident—and the Supreme Court *still* found that there was no substantive due process violation. See Collins, 503 U.S. at 118 n.1. Similarly, in Ramos-Piñero, the city was *specifically* on notice that the area in which the student drowned was prone to flooding and that a manhole in the area was uncovered—and the First Circuit *still* found that there was no substantive due process violation. Finally, Plaintiffs do not allege that the City knew of, or was deliberately indifferent to, any performance issues

15

related to its employees. See Collins, 503 U.S. at 129 (substantive due process "is not a guarantee against incorrect or ill-advised personnel decisions"). Rather, Plaintiffs' Complaint relies on a series of labels, not plausible facts. Regardless, in the circumstances alleged in Plaintiffs' Complaint, which are considerably less egregious than those asserted in Collins and Ramos-Piñero—where, again, no substantive due process violations were found—the City's employees' conduct here was not deliberately indifferent at all, let alone conscience-shocking.

At bottom, to survive dismissal on the substantive due process claim, Plaintiffs must allege that a city employee engaged in conduct that shocks the conscience. Plaintiffs have not done so. Rather, Plaintiffs' claim, like the claims in DeShaney, Collins, Ramos Piñero, and DeAnzona, implicates state tort-law concepts, not substantive due process. Because substantive due process "does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society," Daniels v. Williams, 474 U.S. 327, 332 (1986), Plaintiffs' substantive due process claim should be dismissed.

**2.     Plaintiffs Have Not Plausibly Alleged Supervisory Liability.**

As set forth above, Plaintiffs have not alleged a substantive due process violation. Even if they did, however, Mayor Walsh was not responsible for it.

This standard of liability for supervisory liability is among the highest known in § 1983 litigation and has been categorized as a "high burden" and an "exceptionally stringent" standard. See Trinidad v. City of Boston, 2010 WL 2817186, * 12 (D. Mass. 2010) (citing Young v. City of Providence, 404 F.3d 4, 28 (1st Cir. 2005)). A "supervisor may not be held liable under section 1983 on the tort theory of respondeat superior, nor can a supervisor's section 1983 liability rest solely on his position of authority." Guadalupe-Baez v. Pesquera, 819 F.3d 509, 515 (1st. Cir. 2016). "This does not mean, however, that for section 1983 liability to attach, a

supervisor must directly engage in a subordinate's unconstitutional behavior." Id.  However, "[m]ere negligence will not suffice:  the supervisor's conduct must evince 'reckless or callous indifference to the constitutional rights of others.'"  Id. (citing Febus-Rodríguez v. Betancourt-Lebrón, 14 F.3d 87, 92 (1st. Cir. 1994)).

"If a plaintiff relies on a theory of deliberate indifference, a three-part inquiry must be undertaken."  Guadalulpe-Baez, 819 F.3d at 515.  The plaintiffs must show "(1) that the officials had knowledge of facts from which (2) the officials can draw the inference (3) that a substantial risk of harm exists."  Ramírez-Lluveras v. Rivera-Merced, 759 F.3d 10, 20 (1st. Cir. 2014).  "[D]eliberate indifference alone does not equate with supervisory liability."  Figueroa-Torres v. Toledo-Dávila, 232 F.3d 270, 279 (1st. Cir. 2000).  "Causation remains an essential element, and the causal link between a supervisor's conduct and the constitutional violation must be solid."  Guadalupe-Baez, 819 F.3d at 515.  "That is a difficult standard to meet but far from an impossible one:  a plaintiff may, for example, prove causation by showing inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'"  Id. (citing Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st. Cir. 1994)).  However, "isolated instances of unconstitutional activity" will not suffice.  Id.

Here, Plaintiffs contend, in conclusory fashion, that Walsh's actions or omissions constituted reckless or callous indifference because Walsh maintained deficient hiring, training and supervision practices.  In support of that allegation, Plaintiffs state only that most camp employees were teenagers who, according to Plaintiffs, were "lacking in mature or trained judgment," and that the camp employees were not "adequately trained" because they were not trained on Christian's Law.  (Compl. ¶ 66).  Plaintiffs allege that Walsh knew about Christian's

17

Law because he voted in favor of its passage during his tenure as a member of the Massachusetts House of Representatives.  (Compl. ¶ 60).

What is lacking in Plaintiffs' Complaint, however, is any evidence that Walsh had actual or constructive knowledge of any hiring, training, or supervisory deficiencies, or that he was indifferent to such deficiencies.  Instead, Plaintiffs suggest that had the camp employees been trained on Christian's Law, the decedent's death would have been avoided.  This theory fails because it attempts to prove causation using only negligence, which is impermissible, see Febus-Rodriguez, 14 F.3d at 94, and is simply too tenuous to support a claim against Mayor Walsh.  Id.  Aside from being the Mayor of Boston, there are no allegations that Walsh had any involvement in the structure, hiring, training, or supervision of employees at the Curley Community Center summer camp, or that he even knew what those employees were being trained on or how they were being supervised.  There are no allegations that Walsh was aware of a "known history of widespread abuse" in the administration of City camps.  Instead, Plaintiffs point only to this lone incident which, while tragic, is not enough to support a supervisory liability claim against Mayor Walsh.  See Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st. Cir. 1994).  As noted by the First Circuit:  "[W]e have repeatedly held that…broad allegations against high-ranking government officials fail to state a claim."  Guadalupe-Baez, 819 F.3d at 518 (citing Feliciano-Hernández, 663 F.3d at 534).  Accordingly, the supervisory liability claim against Mayor Walsh should be dismissed.

### C.     MAYOR WALSH IS ENTITLED TO QUALIFIED IMMUNITY.

Although Walsh maintains that Plaintiffs' supervisory liability claim fails on its merits, should the analysis continue, dismissal is nevertheless appropriate because Walsh is entitled to qualified immunity.

"Government officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate *clearly established* statutory or constitutional rights of which a reasonable person would have known.'" Wilson v. Layne, 526 U.S. 603, 609 (1999) (emphasis added), (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The doctrine gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violated the law." MacDonald v. Eastham, 745 F.3d 8 (1st Cir. 2014) (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011)).

In the context of § 1983 supervisory claims in particular, there is a slight deviation from the norm with respect to qualified immunity. "When a supervisor seeks qualified immunity in a § 1983 action, the 'clearly established' prong of the qualified immunity inquiry is satisfied when (1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." Jones v. Han, 993 F. Supp. 2d 57, 69 (D. Mass. Jan. 28, 2014).

The qualified immunity inquiry does not involve hindsight. "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." Canton v. Harris, 489 U.S. 378, 392 (1989). Although "one might lament" officials' failure to apprehend the potential dangerousness of their subordinates' actions, not even officials who are "aware of a problem exhibit[] deliberate indifference by failing to resolve it." Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 536 (1st Cir. 2011). "The question is not whether the [the official] did all they could have, but whether they did all the Constitution requires."

19

Bowen v. City of Manchester, 966 F.2d 13, 20-21 (1st Cir. 1992).  Here, in essence, Plaintiffs argue that because he was aware of Christian's Law, Walsh should have known that the City's failure to implement that law at its summer camps would result in a constitutional violation.  However, as of July 2016, when this incident took place, both the Supreme Court and the First Circuit rejected the argument that a municipality's failure to implement certain policies, failure to follow state law, and failure to provide minimum levels of safety and security could result in a substantive due process violation, as reflected in DeShaney, Collins, and Ramos-Piñero.  The Tenth Circuit in DeAnzona also rejected a constitutional claim on facts nearly identical to the ones alleged here.  As a result, it cannot be said that it was clearly established that the City's failure to implement Christian's Law, or any other policy or protocol, or failure to provide minimum levels of safety, could give rise to a constitutional violation for which Walsh would be responsible.  As a result, Mayor Walsh is entitled to qualified immunity.

## V.    CONCLUSION

WHEREFORE, for the reasons set forth above, Mayor Walsh respectfully requests that that Counts II, VII, and XII of Plaintiffs' Complaint be dismissed with prejudice.

Respectfully submitted:
DEFENDANT, MARTIN J. WALSH

By his attorneys:

/s/ Nicole M. O'Connor
Nicole M. O'Connor (BBO#675535)
Senior Assistant Corporation Counsel
Erika P. Reis (BBO#669930)
Senior Assistant Corporation Counsel
City of Boston Law Department
Boston, MA 02201
(617) 635-4039 (O'Connor)
(617) 635-4031 (Reis)
Nicole.OConnor@boston.gov
Erika.Reis@boston.gov